# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE

PATRICK S. CARMODY,                    )
                                       )          Case No. 2:24-cv-10
    *Plaintiff,*                       )
                                       )          Judge Travis R. McDonough
v.                                     )
                                       )          Magistrate Judge Christopher H. Steger
TENNESSEE DEPARTMENT OF                )
CORRECTIONS, et al.,                   )
                                       )
    *Defendants.*                     )

---

## MEMORANDUM OPINION

---

Plaintiff, an inmate in the custody of the Tennessee Department of Correction ("TDOC") currently housed in the Bledsoe County Correctional Complex ("BCCX"), is proceeding pro se and *in forma pauperis* on a complaint, as amended, asserting various violations of federal and state constitutional and statutory law [Docs. 1, 7]. Plaintiff's complaint is before the Court for screening pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §1915(e)(2)(B) and § 1915A, to determine whether it states a justiciable claim. For the reasons set forth below, this action will be **DISMISSED**.

## I.     PLRA SCREENING STANDARDS

Under the PLRA, district courts must screen prisoner complaints and *sua sponte* dismiss any claims that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See, e.g.,* 28 U.S.C. §§ 1915(e)(2)(B) and 1915A; *Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999). The dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)

"governs dismissals for failure state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). Thus, to survive an initial review under the PLRA, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Courts liberally construe pro se pleadings filed in civil rights cases and hold them to a less stringent standard than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). However, allegations that give rise to a mere possibility that a plaintiff might later establish undisclosed facts supporting recovery are not well-pled and do not state a plausible claim. *Twombly*, 550 U.S. at 555, 570. Further, formulaic and conclusory recitations of the elements of a claim which are not supported by specific facts are insufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 681.

## II.    PLAINTIFF'S RELEVANT ALLEGATIONS[1]

While housed at the Northeast Correctional Complex ("NECX"), Plaintiff discovered that "a number of correctional officers" were introducing illegal drugs at NECX, and they "joined into an alliance to harm" Plaintiff because he contacted the Madison County Deputy Attorney General regarding their conduct [Doc. 1 p. 11–12]. Plaintiff became privy to this information because he was working in "the field office where the officers took their lunchbreaks" when he overheard officers' conversations [*Id*. at 12]. Specifically, Plaintiff learned that Officer Plank,

---

[1] Plaintiff's amended complaint contains all the allegations included in his initial complaint. But his initial complaint included attachments that are not reproduced in the amended complaint. Therefore, the Court considers both complaints for screening purposes. *See Tolliver v. Noble*, 752 F. App'x 254, 266 (6th Cir. 2018) ("[W]hen . . . pleadings are filed by pro se plaintiffs, the court may consider additional, supporting documents which serve to elaborate on a complaint or amend the initial filing.").

the officer assigned to Unit 14, had been introducing contraband, including drugs, "to certain inmates on a regular basis" [*Id*.]. Plaintiff then quit his job "because of inmates dying from overdosing on Fentanyl" [*Id*.]. After Plaintiff quit his job, Officer Plank "advance[d] a frivolous disciplinary infraction against [Plaintiff]" one day after he was "released" from his "new job assignment on the yard crew" [*Id*.].

The disciplinary infraction resulted from a series of events that occurred on October 25, 2022, after Plaintiff, who had been mowing grass all morning, asked to enter his cell to shower before lunch [*Id*. at 12, 60–61, 64]. After Plaintiff had been waiting in front of his cell for twenty minutes, Officer Plank told Plaintiff that he "was on her time and she would open the cell door when she pleased" [*Id*. at 12]. Plaintiff told Officer Plank "she need to leave [him] alone, especially[] when [he] was aware that she was illegally introducing drugs into prison" [*Id*.]. Then, as soon as Plaintiff entered the shower, Officer Plank announced lunch call to prevent Plaintiff from eating [*Id*.]. Plaintiff "exited the shower and asked [Officer Plank] that a Sgt. be called to assist [him] in being able to eat. . ." [*Id*.]. As Plaintiff asked Officer Plank for assistance, Counselor Bradshaw "hit the panic code button on his radio" because he thought Officer Plank was requesting assistance [*Id*. at 13]. Minutes later, Officers Robinson and Swallow entered Unit 14 and asked Plaintiff "who was causing the problem" [*Id*.]. Counselor Bradshaw pointed to Plaintiff, which prompted Officer Swallow to respond, "You called us all the way up here because of him when he causes no problems, whatsoever" [*Id*.]. Plaintiff was told to go get dressed while the officers sorted out what happened [*Id*.].

Plaintiff, who was allowed to remain unrestrained, followed Officers Robinson and Swallow to intake, where they discussed with the shift supervisor "what was to be done regarding the situation that had manifested by Counselor Bradshaw improperly hitting his panic

code button" [Id.]. Plaintiff was instructed to stay in the intake holding cell while the situation was being sorted [Id.]. After Plaintiff was released from the holding cell, he was advised that Officer Plank would be advancing a "defiance" disciplinary infraction against him "in order[] to justify Counselor Bradshaw's improperly issuing a panic code" [Id. at 13; see also p. 63]. Plaintiff was also informed that he needed to go to his cell in Unit 14, an honor unit, and retrieve his property, as he was being moved to Unit 12 per the directions of Unit Manager Cox and Lieutenant Murphy [Doc. 1 p. 14; Doc. 7 p. 17]. Plaintiff was informed that he would receive another disciplinary infraction "for interfering with count" if he did not pack his property and leave Unit 14 in the fifteen minutes remaining until time for count [Doc. 7 p. 17]. While Plaintiff was transferring his property to Unit 12, Officer Plank allowed gang members to enter his cell in Unit 14 and steal some of his property [Doc. 1 p. 61–62; Doc. 7 p. 17].

Plaintiff then composed a letter to his "life[-]long friend," Madison County District Attorney, Shaun Allen Brown, "stating that [his] life was in danger by a number of officers who had been illegally introducing drugs into the prison that had resulted in the death of inmates" [Doc. 1 p. 14] and requesting that he contact Regional Warden of Treatment, Michael Genovese, to have Plaintiff transferred to BCCX [Doc. 7 p. 17]. Within days, Regional Warden Genovese arrived at NECX, but he did not contact Plaintiff [Id.]. And Warden Genovese otherwise failed to act diligently to curb the introduction of contraband into NECX through Centurion and TDOC employees, which, over the years, resulted in numerous overdose deaths that could have been prevented [Id. at 19].

Plaintiff was placed in Unit 12, an honor unit that houses "an 'overwhelming' amount of gang members" [Doc. 1 p. 14]. Plaintiff was placed "directly across the unit from the head gang member" that Officer Plank had been providing contraband to, "in order[] to send [Plaintiff] a

profound message that [he] need[ed] to watch what [he] say[s]" [*Id.*]. That "message" was later confirmed "by the aforementioned head gang member's constituents" [*Id.*].

Once Plaintiff received the defiance disciplinary infraction, he learned Sergeant Worley had created a "false narrative" by omitting the events that occurred in the twenty minutes Plaintiff stood at his cell door before the panic code was issued to "'foster a false impression' resulting in 'substantial unfair prejudice' of a magnitude of the Highest of Orders of a Constitutional nature, irreparably" [*Id.*].

Then Plaintiff requested that Disciplinary Sergeant McClure grant him a continuance of the disciplinary hearing and was informed that the charges would be dismissed because Plaintiff had been properly released from his job assignment [*Id.*]. But the very next day, Plaintiff "was summoned to the disciplinary board and subjected to a trial by ambush" [*Id.* at 15]. Plaintiff was found guilty of the defiance charge "without ever being consulted by an inmate advisor" before the hearing, and, in fact, without learning the identity of the inmate advisor until a week after the hearing [*Id.*]. Plaintiff questioned Inmate Advisor Justice, who was present during the disciplinary hearing in contravention of TDOC policy and procedure [*Id.*]. Plaintiff appealed to Warden Eller, challenging both the charge itself and the lack of due process employed by Sergeant McClure, but Warden Eller did not respond [*Id.*].

Then, on or about November 1, 2022[2], Plaintiff fell in a hole on the ballfield at NECX while participating in a soccer game and sustained what would later be classified a "catastrophic"

---

[2] Plaintiff states that this event occurred on November 21, 2023, but that cannot be accurate given Plaintiff's timeline of events, as Plaintiff claims he received no real medical treatment for nine months following his accident [*Compare* Doc. 1 p. 9 *with* Doc. 1 p. 16]. He also attached to his complaint (1) a letter referencing medical care he received at the Hamilton County Jail in early 2023 following his injury [Doc. 1 p. 19] and (2) documents from mid-2023 referencing the injury [Doc. 1 p. 29–30, 32, 33]. Therefore, the Court assumes for present purposes that Plaintiff made a typographical error as to the year of the event.

injury [Doc. 1 p. 3, 9]. NECX staff had closed the ballfield the two previous winters "for the purpose of repairing the turf[,]" but the field was never repaired [*Id.*]. After Plaintiff fell, he returned to Unit 12, where he remained until lockdown was lifted and it was time for lunch [*Id.* at 9]. When Plaintiff attempted to walk to lunch, he "could not sustain a continuous ga[i]t[]" [*Id.*]. Plaintiff sat down at the security checkpoint and advised Officer White that he was having trouble walking [*Id.*]. After lunch, Plaintiff fell outside Unit 12 "because [he] had become numb from the waist down and could not sustain [his] balance or spatial orientation" [*Id.*]. Plaintiff was taken to the clinic by an unidentified person and "was seen by Jane Doe Nurse 1 and held for basic medical care" [*Id.*]. Plaintiff asked the attending physician, Dr. Faber, "if [] the medical staff was going to wait until [he] was numb to [his] shoulders before they would airlift [him] off the compound" [*Id.*]. In reply, Dr. Faber stated that he "would not wa[]st[e]" the $60,000 it would cost to airlift Plaintiff [*Id.*]. Plaintiff was told that there was nothing wrong with him and to return to his cell [*Id.*].

Sometime later, due to lower-body numbness Plaintiff was experiencing, Plaintiff fell again and hit his head on the toilet [*Id.*]. Plaintiff was escorted to the medical clinic and was informed he would be placed in a medical holding cell for observation over the weekend until Dr. Faber returned [*Id.*].

While Plaintiff was in the clinic, staff operated the air conditioning, even though the temperature was in the mid-to-low twenties, to dissuade inmates from seeking medical treatment [*Id.* at 10]. On the first day he was housed in the clinic, Plaintiff "began to experience an inability to urinate" and "began to experience a significant amount of blood being discharged from [his] penis [] and an 'extreme' amount of pain of a magnitude of the highest of orders such

6

as [he] had never experienced in [his] life" [*Id.*]. Plaintiff could only hold a "plank position" in bed due to the pain he was suffering [*Id.*].

On Plaintiff's second day in the clinic, he realized, due to the extreme pain he was experiencing, that his body must be trying to pass kidney stones [*Id.*]. He "strain[ed] [him]self at regular intervals" to pass the kidney stones and finally passed the first kidney stone that evening [*Id.*]. By the end of the weekend, Plaintiff had passed three kidney stones, "which almost killed [him]" [*Id.*].

According to Plaintiff, "[a]fter experiencing a myriad of cruel and unusual actions by the medical staff throughout the weekend that shall not be specifically identified at this juncture," Jane Doe Nurse 2 told Plaintiff that he would have to move back to his cell in Unit 12, that he "needed to hurry and leave the clinic, 'and that they would be taking [his] wheelchair'" [*Id.* at 11]. When Plaintiff explained that he needed the wheelchair due to his inability to properly walk and his problems with spatial orientation, Jane Doe Nurse 2 stated that she was "going to relearn [Plaintiff] how to walk" before grabbling Plaintiff's arm and pulling him down the hallway [*Id.*]. Plaintiff was terrified and begged her to stop [*Id.*]. Eventually, the medical staff "permitted [Plaintiff] to go back to the cell from which [he] came after the clinic janitorial staff inmate cleaned the urine and blood off the floor that had accumulated over the weekend" [*Id.*]. Plaintiff experienced "psychological harm throughout the weekend by having to traverse such a dangerous condition to access the toilet" [*Id.*].

After Plaintiff was checked out of the clinic area, he was issued a walker instead of the wheelchair he had been previously provided [*Id.*]. Plaintiff "was forced to drag [his] right leg on the sidewalk behind the walker," which caused him excruciating pain [*Id.*]. Because of the pain he experienced when walking, Plaintiff missed "a myriad of meals" that diminished his health

7

and placed him in a "spiraling psychological state" that reduced him to a "shadow of a man" [*Id.*].  Plaintiff was also told over the following months that his spine was healthy, and that he suffered from "psychosomatic delusions" [*Id.* at 15, 19].

At some point in early 2023, Plaintiff was transferred to the Hamilton County Jail, where he remained for several months and received medical care for the injury sustained at NECX [*Id.* at 19].  Plaintiff returned to NECX, and on July 13, 2023, he was transferred to BCCX, where he received x-rays and the use of a wheelchair [*Id.* at 16, 19, 53].[3]  He was also advised that he would receive a "zoom visit" with an orthopedist soon [*Id.* at 16].  But a few weeks later, Plaintiff was in the clinic for a routine examination when he conveyed to the attending physician, Dr. Samuels, "the nature of [his] injury" and the lack of medical treatment for the previous nine months [*Id.*].  Dr. Samuels ordered Plaintiff to be sent to the Special Needs Prison ("SNP") in Nashville to receive a magnetic resonance imaging ("MRI") examination [*Id.*].  The MRI exam was conducted, and Plaintiff was returned to BCCX Site 2 to await the results, which revealed that he would require surgery to repair "'catastrophic' spinal stenosis and [] corresponding nerve damage . . . throughout L2-L5 of [his] lumbar system" [*Id.*].

Once Plaintiff returned to BCCX from SNP, he was "subjected to a myriad of abusive behavior[] and retaliation" [Doc. 7. p. 21].  On November 21, 2023, "certain officers" at BCCX "failed to advance Plaintiff's mail" containing notice of his intended medical malpractice complaint relating to his injuries [*Id.*].  Therefore, on November 29, 2023, Plaintiff mailed the notice through Officer Breeden in the BCCX mailroom, but Officer Breeden refused to sign Plaintiff's documentation letter [*Id.*].  On November 30, 2023, following Officer Jordan's threat

---

[3] Plaintiff had apparently been authorized to use a wheelchair at some point prior to his transfer to BCCX, as he alleges that BCCX Intake Officer Roberson took the wheelchair from Plaintiff while he was "in transit" at BCCX [Doc. 7 p. 20].

to lodge disciplinary charges against Plaintiff in retaliation for him "challenging her 'routine' for allowing inmates to have access to the library," Plaintiff was transferred to a Unit 9 cell with a known drug user under the guise of an "institutional need" [*Id.*]. On November 3, 2023, Officer Mabe entered Unit 9 and bypassed ten cells to conduct a "random" cell search of Cell 11– Plaintiff's cell [*Id.*]. During the search, Officer Mabe found various contraband in the belongings of Plaintiff's cellmate, and Officer Mabe charged both Plaintiff and his cellmate for paraphernalia and drugs [*Id.*].

On December 5, 2023, Plaintiff requested a continuance of the disciplinary hearing on the grounds that he wanted to have Officer Mabe present at the hearing to offer testimony favorable to him, which Officer Mabe indicated he would do [*Id.* at 22]. But Officer Mabe was not present at the hearing, and the request for a continuance was denied [*Id.*]. Plaintiff was informed that if he demanded a hearing, "he would be found guilty and sent directly to the 'hole[,]'" but that if he accepted responsibility for the charge, he would receive only a sixty-day probationary period and no further adverse effects would arise from the agreement [*Id.*]. In violation of TDOC disciplinary procedures and constitutional principles, Plaintiff was never informed that he could have his good time credits taken, his classification points increased, or that he would be ineligible for certain BCCX jobs if he agreed to plead guilty [*Id.*].

Aggrieved, Plaintiff filed the instant lawsuit against TDOC, Frank Strada, Lee Dotson, Kenneth Williams, Gail Johnson, Michael Genovese, Warden Eller, Acting Warden of Treatment ("AWT") Andrews, Lieutenant Murphy, Unit Manager Cox, Sergeant McClure, Officer Plank, Sergeant Worley, Officer Roberson, Officer Jordan, Officer Breeden, Officer Mabe, Officer Potter, Unit Manager Hensley, Sgt. Dykes, Sergeant Winn, Captain James, AWT Brett Cobble, Warden Phillips, Centurion of Tennessee, LLC ("Centurion"), Steven Wheeler, Health

Administrator Jane Doe 1, Health Administrator Kathryn Campbell, Dr. Faber, Jane Doe Nurse 2, and Jane Doe Nurse 3 [Doc. 7 p. 3] seeking declaratory and monetary relief [Doc. 1 p. 16–17; Doc. 7 p. 23–24].[4]

## III.  ANALYSIS

Plaintiff seeks monetary damages in this case for the "[a]bridgement of his rights secured" under the Eighth and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act[5] ("ADA"), 42 U.S.C. § 12101, *et. seq.*; §§ 504 and 704 of the Rehabilitation Act, 29 U.S.C. § 701, *et. seq.*; 28 C.R.F. § 35.130(b)(7); Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*; and 42 U.S.C. § 1981(a)[6] [Doc. 7 p. 2].  He also alleges that Defendants have committed "state torts" under the Tennessee Health Care Liability Act ("THCLA") [Doc. 1 p. 2; Doc. 7 p. 3].

### A.  42 U.S.C. § 1983 Claims

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that a "person" acting "under color of" state law deprived him of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.

#### 1.  Time-Barred Claims

Plaintiff states that in 2022 (1) he was "released" from his new job; (2) he received a false disciplinary infraction for defiance; (3) he was moved to a Unit 12; (4) his property was

---

[4] The Court notes that Defendant Murphy is listed in the caption of Plaintiff's lawsuit but not in the body of the "Parties" section [Doc. 7 p. 1, 4–11].

[5] Plaintiff cites "U.S.C. 42 § 12191 *et. seq.*" [Doc. 7 p. 2].  But that section does not exist, and the citation is similar to the citation for the ADA.  Therefore, the Court construes Plaintiff's claim under the ADA.

[6] Plaintiff cites "42 U.S.C. § 1981@(b)(3)" [Doc. 7 p. 2].  Because that subsection does not exist, the Court construes this as a request for damages under 42 U.S.C. § 1981(a).

stolen during the move; (5) Regional Warden Genovese did not contact Plaintiff after learning of Plaintiff's imperiled situation at NECX; (6) he was placed in Unit 12 in close proximity to a known drug dealer as a "message" from NECX staff; and (7) he was denied a fair and impartial disciplinary hearing [*See generally* Docs. 1, 7]. It is unclear whether all these events are intended as claims, or whether Plaintiff merely includes them for factual completeness. Regardless, the latest of these events appear to have occurred by November 22, 2022, when his grievance appeal concerning his unit transfer and lost property was denied [*See* Doc. 1 p. 58].

Tennessee's statute of limitations for personal injury actions is applicable to Plaintiff's § 1983 claims. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Tennessee, that period is one year. *See Tenn. Code Ann.* § 28-3-104; *Foster v. State*, 150 S.W.3d 166, 168 (Tenn. Ct. App. 2004) (applying the one-year statute of limitations from Tenn. Code Ann. § 28-3-104 in a § 1983 claim). When the statute begins to run, however, is an issue of federal law. *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (citations omitted). Under federal law, a cause of action accrues, and the limitations period begins to run, when the injury forming the basis of the claim is discoverable, s*ee Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991) (citing *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)), or when the cause of action is complete, *Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1162 (6th Cir. 2021) (acknowledging that the "standard" rule starting limitations period is "when the plaintiff has a complete and present cause of action").

Any claims relating to the loss of Plaintiff's job, disciplinary charge for defiance, unit transfer, loss of property, and infirmities in Plaintiff's October 2022 disciplinary hearing were discoverable and complete when the acts occurred, the latest of which occurred in November

2022. However, Plaintiff did not file the instant suit until December 26, 2023[7], which is past the expiration of the one-year limitations period for these allegedly unconstitutional actions. Therefore, these claims must be dismissed. *See In re Royal Manor Mgmt., Inc*., 652 F. App'x 330, 339–40 (6th Cir. 2016) (noting that "courts have no authority" to modify "statute-of-limitations deadlines"); *Castillo v. Grogan*, 52 F. App'x 750, 751 (6th Cir. 2002) ("When a meritorious affirmative defense based upon the applicable statute of limitations is obvious from the face of the complaint, sua sponte dismissal of the complaint as frivolous is appropriate.") (citation omitted). Therefore, these claims will be **DISMISSED**.

Because the only factual allegations against Defendants Plank, Cox, Murphy, Genovese, Worley, McClure, and Eller involve Plaintiff's time-barred claims, these Defendants will be **DISMISSED**.

### 2. Official-Capacity Claims

Plaintiff has named TDOC and Centurion as Defendants in this action, and he has sued all the individual Defendants in their official capacities [*See* Doc. 1 p. 4–8; Doc. 7 p. 4–11].

#### a. TDOC

The TDOC is an arm of the State of Tennessee, and therefore, suit against the TDOC is suit against the State itself. *See Hix v. Tenn. Dep't of Corr*., 196 F. App'x 350, 355 (6th Cir. 2006) (holding TDOC is equivalent of the "State"). And suit against a TDOC employee in his or her official capacity is essentially suit against the TDOC. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding "an official-capacity suit is, in all respects other than name, to be

---

[7] Plaintiff signed his complaint on December 26, 2023 [Doc. 1 p. 17]. A prisoner's petition is deemed "filed" when it is submitted to prison officials for mailing. *See, e.g., Houston v. Lack*, 487 U.S. 266, 273 (1988). Under Sixth Circuit precedent, the date Plaintiff signed the document is typically deemed the date of handing it to the prison authorities for mailing. *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008).

12

treated as a suit against the entity"); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."). Therefore, all of Plaintiff's official capacity claims against the TDOC and TDOC employees are properly considered as against the State of Tennessee.

However, "a State is not a person within the meaning of § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Hix*, 196 F. App'x at 355 (holding TDOC is not a "person" within meaning of § 1983). Additionally, the Eleventh Amendment prohibits suits against a state or its agencies in federal court for damages, unless Congress has abrogated its immunity, or the state has expressly waived it. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–101 (1984); *Quern v. Jordan*, 440 U.S. 332, 345 (1979). This immunity extends to claims for injunctive and equitable relief. *See Lawson v. Shelby Cnty.*, 211 F.3d 331, 335 (6th Cir. 2000) ("[T]he [Eleventh] Amendment prohibits suits against a 'state' in federal court whether for injunctive, declaratory[,] or monetary relief."). The State of Tennessee has not waived its immunity to suit under § 1983. *Berndt v. State of Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986). Accordingly, Plaintiff cannot maintain suit against TDOC or TDOC Defendants in their official capacities, and all claims against TDOC and the TDOC Defendants in their official capacities will be **DISMISSED**.

### b.    Centurion

Plaintiff has also sued Centurion and its employees in their official capacities [*See* Doc. 1 p. 4–8; Doc. 7 p. 4–11]. Centurion is a private company contracted to provide medical services at TDOC facilities. And where a private entity contracts with the state to perform a traditional state function (such as providing medical care at a penal institution), it acts under color of state law and may be sued under 42 U.S.C. § 1983. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810,

814 (6th Cir. 1996). However, a private entity cannot be subject to § 1983 liability merely because it has employed someone who violated Plaintiff's constitutional rights; that is, it "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

Rather, to demonstrate that Centurion bears any liability, Plaintiff must identify a policy or custom of the company and show that his particular injury was incurred due to the execution of that policy or custom. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and quotation marks omitted); *see also Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 627 (6th Cir. 2011) (holding plaintiff must allege "a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation" of his rights). But Plaintiff has not set forth any facts from which the Court could infer that his constitutional rights were violated by a policy or custom of Centurion, and Centurion will be **DISMISSED**. And because suit against a Centurion employee in his or her official capacity is suit against Centurion itself, *Graham*, 473 U.S. at 166; *Monell*, 436 U.S. at 690 n.55, all official capacity claims against the individual Centurion Defendants in their official capacities are likewise **DISMISSED**.

### 3.       Individual-Capacity Claims

Plaintiff asserts individual-capacity claims against the remaining Defendants: Frank Strada, Lee Dotson, Kenneth Williams, Jane Doe Nurse 1, AWT Andrews, Centurion Chief Executive Officer ("CEO") Wheeler, Dr. Faber, Jane Doe Nurse 2, and Jane Doe Nurse JU3 [*See, e.g.*, Doc. 7 p. 4–11]. To state a claim against any of these individual Defendants, Plaintiff must adequately plead that each Defendant, by his or her own actions, has violated the Constitution. *See Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights" to state a claim upon which relief may be granted). This requirement exists

because constitutional liability cannot attach to a Defendant solely based on his or her position of authority. *See Iqbal*, 556 U.S. at 676; *Monell*, 436 U.S. at 691.

Plaintiff's complaint and amended complaint contain no factual allegations against Defendants Strada, Dotson, Williams, Andrews, Wheeler, or Jane Doe Nurse 3, much less that they were personally involved in any constitutional wrongdoing. Therefore, Plaintiff has failed to state a claim against any of these Defendants, and they will be **DISMISSED**.

Additionally, most of Plaintiff's complaints surrounding the medical care at NECX are not tied to a particular individual. For example, he claims, without identifying the responsible party, that the clinic was too cold, he had to traverse a great distance to use the restroom, he was in extreme pain during the weekend due to kidney stones, he "experience[ed] a myriad of cruel and unusual actions by the medical staff throughout the weekend that shall not be specifically identified at this juncture[,]" he was issued a walker instead of a wheelchair, and that his health was diminished due to his limited mobility with the walker [*See* Doc. 7 p. 13–14]. But because Plaintiff has not associated these facts with any particular Defendant's alleged wrongdoing, the Court will not address them further.

Plaintiff does, however, allege that Dr. Faber, and Jane Doe Nurses 1 and 2 failed to provide him constitutionally adequate medical treatment following his ballfield injury at NECX [*See* Doc. 1 p. 9–11; Doc. 7 p. 12–14]. These allegations implicate the Eighth Amendment, which prohibits deliberate indifference to a prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To demonstrate a violation of the Eighth Amendment with regard to his medical treatment, Plaintiff must show a "sufficiently serious" medical need that the Defendants responded to with "deliberate indifference." *Farmer v. Brennan*, 511 U.S. 825, 834, 842 (1994). That is, a prisoner must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could

15

be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Plaintiff cannot sustain a § 1983 claim by alleging health care officials were negligent in failing to treat him adequately; deliberate indifference requires a mental state amounting to criminal recklessness. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839–40). And only acts or omissions that produce an "unnecessary and wanton infliction of pain" implicate the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Thus, a prisoner cannot state a claim of deliberate indifference by suggesting that he was misdiagnosed or not treated in a manner he desired. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997) (finding "[m]isdiagnoses, negligence, and malpractice" are not "tantamount to deliberate indifference"). As the Supreme Court has explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105–06 (internal quotation marks omitted).

Plaintiff maintains that when he was first taken to the medical clinic, he was "seen by Jane Doe Nurse 1 and held for basic medical care," including "pulse checks, blood pressure checks, and temperature check" [*See* Doc. 7 p. 9]. Therefore, Jane Doe Nurse 1 rendered medical assistance to Plaintiff, and Plaintiff does not allege that Jane Doe Nurse 1 appreciated a serious risk to his health that she ignored, or that she had the authority to authorize any treatment to Plaintiff without a physician's authorization. Accordingly, Plaintiff has failed to state a

cognizable claim that Jane Doe Nurse 1 was deliberately indifferent to any serious medical need of Plaintiff, and she will be **DISIMSSED**.

As to Jane Doe Nurse 2, Plaintiff alleges she (1) advised Plaintiff that he would need to move back to his cell in Unit 12 from the medical clinic; (2) advised Plaintiff that "they would be taking [his] wheelchair"; and (3) stated she would "relearn [Plaintiff] how to walk" and "pulled [Plaintiff] down the hallway of the clinic" by his arm [*See id*. at 11]. Plaintiff does not allege, nor can the Court infer from the facts presented, that Jane Doe Nurse 2 was responsible for deciding to remove Plaintiff from the medical unit back to his cell in Unit 12[8], or that she was responsible for revoking his authorization to have a wheelchair. And Plaintiff's allegations that Jane Doe Nurse 2 stated she was going to retrain him to walk and pulled him down the hallway do not rise to the level of deliberate indifference, as nothing in the facts recounted by Plaintiff suggest that those actions posed a serious risk to Plaintiff's health or safety, or that Jane Doe Nurse 2 appreciated such a risk and ignored it.[9]

Finally, Plaintiff claims that Dr. Faber told Plaintiff (1) that he was not going to waste money airlifting Plaintiff, (2) that "there was nothing wrong with" Plaintiff, and (3) to return to his cell [Doc. 7 p. 9]. And although he does not cite Dr. Faber, specifically, Plaintiff also states that over the course of the next nine months with "no medical care or treatment[,]" he was told that he suffered "'psychosomatic delusions' and that [his] inability to walk was all in [his] head" [*Id*. at 16]. But neither Plaintiff's complaint nor his amended complaint contains any facts to indicate what sort of assessment Dr. Faber performed on Plaintiff to reach the conclusion that

---

[8] The Court notes that it seems Plaintiff was not actually moved back to Unit 12 at that time, as he maintains that "the medical staff permitted [him] to go back to the cell from which [he] came" after it was cleaned [Doc. 7 p. 11].

[9] Plaintiff does not allege that he suffered any physical injury or pain due to Jane Doe Nurse 2's conduct, but rather, only that he was "terrified" [Doc. 7 p. 11].

17

"there was nothing wrong with [him]" [*See* Doc. 1 p. 9]. And Plaintiff has not pled any facts suggesting that Dr. Faber delayed treating a serious injury with deliberate disregard to Plaintiff's medical needs, as opposed to making a medical judgment (even if it later turned out to be erroneous) that no treatment was warranted. As the Supreme Court has explained, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Such is the case here. Therefore, Plaintiff's claims against Dr. Faber will be **DISMISSED**.

### 4. Misjoined Claims

This leaves the Court to consider Plaintiff's § 1983 claims against the BCCX Defendants. Plaintiff's initial complaint related to events that occurred while he was housed at NECX [Doc. 1], but his amended complaint includes his original allegations plus additional claims relating to events that occurred once he was moved to BCCX [Doc. 7]. Therefore, some of Plaintiff's claims in his complaints are unrelated and against different Defendants. Such claims are not properly joined in this action under Rule 20(a)(2) of the Federal Rules of Civil Procedure.

While a plaintiff may join as many claims as he has against an opposing party under Rule 18(a) of the Federal Rules of Civil Procedure, Rule 20(a)(2) allows a plaintiff to sue multiple defendants only where "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). Therefore, Rule 20 does not permit a plaintiff to join unrelated claims against different defendants in one lawsuit. *See, e.g., George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) ("A buckshot complaint that would be rejected if filed by a free

18

person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions—should be rejected if filed by a prisoner."); *Smith v. Lavender*, No. 2:22-CV-1875, 2022 WL 4121929, at *6 (S.D. Ohio, Sept. 9, 2022) (severing unrelated claims a prisoner filed in the same complaint against different defendants) (citations omitted); *White v. Newcomb*, 2022 WL 2763305, at *4-5 (W.D. Mich. July 15, 2022) (providing that a plaintiff cannot join claims against multiple defendants in one lawsuit "'unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact'" (quoting *Proctor v Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009) and collecting cases standing for the proposition that prisoners cannot join unrelated claims against different defendants in a single lawsuit)).

The first claim listed in Plaintiff's complaint is "deliberate indifference" that occurred at NECX [Doc. 1 p. 9]. And Plaintiff's claims against the NECX Defendants are unrelated to his allegations against the BCCX Defendants. Therefore, the Court finds that Plaintiff's claims regarding events that occurred at NECX are related, and his claims against the BCCX Defendants are improperly joined in this action. Thus, Plaintiff's claims related to events that occurred at BCCX will be **DISMISSED** without prejudice to Plaintiff's ability to file a separate civil action asserting those claims. The Clerk will be **DIRECTED** to mail Plaintiff a § 1983 form and application to proceed without prepayment of the filing fee, which Plaintiff should complete and remit to the Court **only** if he desires to file a separate civil action for which he must pay the PLRA filing fee.

Because the claims against them are improperly joined in this action, Defendants Roberson, Jordan, Breeden, Mabe, Potter, Hensley, Dykes, Winn, James, Campbell, Cobble, and Phillips will be **DISMISSED**.

In sum, Plaintiff has failed to state a claim against any Defendant on which § 1983 relief may be granted, and all Plaintiff's claims under § 1983 will be **DISMISSED**.

### B.    Other Federal Claims

Aside from Plaintiff's § 1983 claims, Plaintiff "brings this civil rights complaint for monetary damages" to vindicate rights secured by Title II of the Americans with Disabilities Act[10] ("ADA"), 42 U.S.C. § 12101, *et. seq.*; §§ 504 and 704 of the Rehabilitation Act, 29 U.S.C. § 701, *et. seq.*; 28 C.R.F. § 35.130(b)(7); Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*; and 42 U.S.C. § 1981(a)[11] [Doc. 7 p. 2].  But Plaintiff has not alleged any facts under any of these provisions.  That is, he has simply cited various statutory provisions that purportedly entitle him to relief without producing any explanatory, factual underpinning [*See id.*]. Accordingly, the Court finds that this portion of Plaintiff's complaint and amended complaint fails to comply with Rule 8(a) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 8(a)(2) (providing pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief").  And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a plausible claim for relief.

---

[10] Plaintiff cites "U.S.C. 42 § 12191 *et. seq.*" [Doc. 7 p. 2].  But that section does not exist, though it is similar to the citation for the ADA.  Therefore, the Court construes Plaintiff's claim under the ADA.

[11] Plaintiff cites "42 U.S.C. § 1981@(b)(3)" [Doc. 7 p. 2].  Because that subsection does not exist, the Court construes this as a request for damages under 42 U.S.C. § 1981(a).

*See Iqbal*, 556 U.S. at 678. Accordingly, any intended claims based on violations of the ADA, C.R.F. § 35.130, the Rehabilitation Act, Title VII, or 42 U.S.C. § 1981 are **DISMISSED**.

### C. State Law Claims

Because the Court is dismissing all Plaintiff's federal claims, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over the remaining state law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–727 (1966) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well.").

## IV. CONCLUSION

For the reasons set forth above, it is **ORDERED**:

1.   Plaintiff has failed to state a claim upon which relief may be granted, and all Plaintiff's federal claims are **DISMISSED** pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A;

2.   The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and they are **DISMISSED** without prejudice; and

3.   The Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

21